IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION

| | |
|---|---|
| Donna Lunday,))Plaintiff,))vs.))Dirk Kempthorne, Secretary, United States)Department of Interior, or his predecessor-)in-office; United States Department of)Interior;))Defendants.) | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 4:07-cv-084 |

Before the Court is the Defendants' "Motion for Summary Judgment," filed on June 10, 2011. See Docket No. 47. The Plaintiff, Donna Lunday, filed a response on July 18, 2011. See Docket No. 54. On July 28, 2011, the Defendants filed a reply. See Docket No. 55. For the reasons set forth below, the Court grants the Defendants' motion.

I.BACKGROUND

The Plaintiff, Donna Lunday, worked for the Bureau of Indian Affairs, Office of Indian Education Programs at the Turtle Mountain Elementary School in Belcourt, North Dakota from August 1996 to September 2005. See Docket No. 48-2. Lunday worked as an "Education Specialist/Nutritionist" at the school. See Docket No. 48-2. She was the head of the Food Services department where she managed the food programs, planned the meals, supervised the cafeteria staff, and performed tasks related to budget and financial management for the Food Services department. See Docket No. 48-2, p. 2.

1

The Food Services department at the Turtle Mountain Elementary School ("the School") received funding from three sources: (1) food reimbursement dollars from the State of North Dakota ("state reimbursement") based on the number of students enrolled at the School; (2) nominal fees collected from teachers and others who ate at the School; and (3) an approximate $100,000 stipend from the Belcourt School District paid directly to the Food Services department's vendors. See Docket Nos. 48-24, p. 20; 48-3, pp. 86-87; 55-1; and 55-2. When the Food Services department's expenses exceeded the funds generated from these three sources, the School used dollars from the Indian Student Equalization Program ("ISEP") to cover the shortfall. See Docket No. 48-24, pp. 20-27, 33. ISEP is a general fund provided by the federal government based on the number of students enrolled at the School. See Docket Nos. 48-24, pp. 17-18. The School allocated ISEP dollars to cover a portion of the Food Services department's expenses at least since the 2001-02 school year. See Docket Nos. 48-24, pp. 42-43 and 48-25, p. 16.

The School, and specifically the Food Services department, began to experience budget constraints during the 2002-03 and 2003-04 school years. A number of factors contributed to the problem such as lower student enrollment, higher fuel costs, and decreased funding for special education. See Docket Nos. 48-24, pp. 29-30; 49-10, pp. 48-49; and 54-3, p. 6. As a result, the School received fewer ISEP funds due to lower enrollment and expended additional ISEP funds on fuel and special education. As a result, the School decreased the ISEP funds available for the Food Services department. See Docket No. 48-25, p. 16 (ISEP budget for Food Services went from $298,484 in 2001-02 to $207,798 in 2002-03). Lower enrollment also decreased the state reimbursement funds received by the food service department. In both 2002-03 and 2003-04, Food Services spending exceeded its budget. See Docket No. 48-25, p. 16 (showing 2002-03 budget deficit of $65,316, and 2003-04 budget deficit of $131,213).

David Gourneau began supervising Donna Lunday on January 5, 2004 after he became principal of the School. See Docket No. 48-3, p. 229. Gourneau occasionally asked Lunday to come into work during June and July 2004 even though Lunday was furloughed during the summer months. See Docket No. 32-1, p. 3. Gourneau also required Lunday to attend training in July 2004. See Docket No. 32-1, p. 3. Male and female co-workers also attended the training. See Docket No. 54-9, pp. 4, 7. The State of North Dakota paid for the training and lodging and provided a $100 stipend for expenses. See Docket Nos. 48-3, pp. 130-31 and 54-9, p. 4. Lunday was not compensated for her time while attending the training or working in the summer of 2004. However, Lunday did not submit the necessary written requests for payment after she was advised to do so. See Docket Nos. 48-3, pp. 128-30 and 54-9, p. 4, 6.

On one occasion Lunday left work early to take her child to the emergency room. See Docket Nos. 32-1, p. 3 and 54-9, p. 14. Prior to leaving school, Lunday attempted to locate Gourneau to tell him about the emergency but Gourneau was on lunch break. See Docket No. 54-9, p. 14. Lunday filled out a leave slip and left the slip in Gourneau's office. Although the School policy does not require the building principal to sign a leave slip prior to leaving the school for an emergency,[1] Lunday claims Gourneau was upset because she left without getting the leave slip signed. See Docket No. 54-9, pp. 14-15. The next day Gourneau slammed Lunday's office door, pointed his finger closely to her face, and shouted that she must always get leave slips signed before she left school. See Docket No. 54-9, p. 15. Gourneau did not physically touch Lunday but she felt threatened by his conduct. See Docket Nos. 48-3, pp. 139-40 and 54-9, p. 16.

---

[1] The School policy for emergency leave states "staff requiring emergency leave shall contact the building principal or the principal's designee, and fill out a leave slip before leaving the premises. Emergency leave should be taken only for dire circumstances involving yourself, or your immediate family." See Docket No. 48-14, p. 2.

3

In December 2004, Gourneau told Lunday he was unhappy with the sack lunch served in lieu of a hot meal even though he approved the sack lunch earlier. See Docket No. 32-1, pp. 3-4. Later in December, Gourneau told Lunday to read a book over Christmas vacation. See Docket No. 32-1, p. 4. Lunday believed this was inappropriate to assign work during vacation. However, she observed other supervisors, including men, receive the book on the same day. See Docket No. 54-10, p. 11. Lunday did not read the book during the winter break, but reviewed it when she returned to work in January. Lunday was not disciplined for failing to read the book. Gourneau did not ask her if she read it. See Docket No. 48-3, p. 135.

Additionally, in December 2004, Gourneau confronted Lunday about a comment her father, Jack Lunday, allegedly made about Gourneau. See Docket No. 32-1, p. 4. Gourneau heard that Jack Lunday said that he was ignorant about nutrition. See Docket Nos. 32-1, p. 4 and 54-10, p. 7. Donna Lunday explained that she may have made comments about Gourneau to her family. See Docket No. 54-10, p. 7. Gourneau then told Donna Lunday that if Jack Lunday had anything to say that he should say it to Gourneau's face. See Docket Nos. 32-1 and 54-10, pp. 7-8. Lunday again said she felt threatened by Gourneau's conduct. Docket No. 54-10, p. 8.

On December 10, 2004, Lunday asked Gourneau if she could modify the school lunch menu because five Food Services staff members were absent due to sickness. See Docket Nos. 32-1, p. 4 and 54-10, pp. 1-2. Instead of authorizing the menu change, Gourneau requested that Lunday assist the cafeteria staff prepare lunch. See Docket No. 54-10, pp. 2-3. Lunday's job description states "[t]his is a working supervisor position and will be required to perform entire duties of the School Cafeteria Cook position." See Docket Nos. 48-2, p. 2 and 48-3, pp. 34-35. Lunday told Gourneau her other work responsibilities did not allow her time to cook. Lunday did not cook, but was not disciplined. On January 6, 2005, Gourneau showed Lunday her job description and told her she had

4

to cook.  See Docket No. 54-10, pp. 11-12.  Lunday reiterated that her other obligations left no time to cook and declared she would resign if Gourneau required her to cook.  See Docket No. 54-10, p. 12.  Gourneau told her that he expected Lunday's resignation by the end of the day if she refused to cook.  See Docket No. 54-10, p. 12.

Immediately after the meeting with Gourneau on January 6, 2005, Lunday went to the Educational Line Office and requested a different supervisor.  See Doc. 32-1, p. 4.  The Educational Line Officer, Rose Davis, granted Lunday's request.  Louis Dauphinais, the principal of Turtle Mountain Middle School, became Lunday's supervisor on February 1, 2005.  See Docket No. 54-10, p. 26.

On January 10, 2005, Lunday spoke with an Equal Employment Office ("EEO") counselor regarding her interactions with Gourneau.  See Docket No. 54-2.  The EEO counselor contacted Gourneau on January 25, 2005 to discuss Lunday's allegations.  Lunday filed a formal complaint with the EEO on January 31, 2005, and alleged sexual harassment hostile work environment and gender discrimination.  See Docket No. 32-1.  She asserted Gourneau shouted at her, physically intimidated her, forced her to work without pay, and had unreasonably requested her to cook.

Although Lunday was supervised by Louis Dauphinias after January 31, 2005, she continued to regularly interact with Gourneau.  Because Gourneau was responsible for the School's budget which included the Food Services department's budget, Lunday presented requisition requests directly to Gourneau.  Lunday contends that after she filed her formal complaint that Gourneau began to routinely scrutinize and deny requisition requests.  See Docket No. 48-3, pp. 107-12.  Lunday also asserts that Gourneau denied her request for mandatory training after she filed the formal complaint. See Docket No. 32-4.  Gourneau explained that he denied Lunday's request for training and other

5

requisition requests because of concerns about possible deficits in the Food Service department's budget. See Docket No. 54-11.

In February or March, 2005, Gourneau and School business manager Donna Azure-Lavurdere[2] began discussing a reduction-in-force ("RIF") for the Food Service department staff and specifically Lunday. See Docket No. 54-4, p. 1. Gourneau presented a plan to reorganize the Food Services department to the School Board on April 11, 2005. See Docket No. 49-17, p. 2. The minutes of the meeting state, in part:

> **Reorganization** - Mr. Gourneau presented the Organizational Chart and recommended that under Food Service Department (Kitchen) we go from an Education Specialist Nutritionist to a Head Cook position. Lynell motioned to approve the reorganization chart as presented. Viola seconded. Roll call vote taken. All in favor. Motion carried.

See Docket No. 49-17, p. 4 (emphasis in original). Gourneau explained that he did not ask the School Board to eliminate Lunday's position, but instead stated the Education Specialist/Nutritionist could become the "Head Cook" as an example of a reorganization. See Docket No. 54-4, pp. 3-4.

At the next School Board meeting on May 16, 2005, Gourneau recommended a RIF for Lunday's position along with five part-time positions in the Food Services department. See Docket No. 49-17, p. 2. The School Board meeting minutes state:

> **Reorganization/Food Service**
> Dave [Gourneau] presented the Organizational Chart and is requesting to abolish the Education Specialist/Nutritionist and five (5) part-time positions under Food Service and advertise for a School Cook. The Business Manager [Donna Azure-Lavurdere] said we need to take a look at the budget because we cannot afford to pay the salaries. After discussion, Viola motioned to approve the Organization Chart as presented. After third call motion died due to the lack of a second. No further business.

---

[2] Donna Azure-Lavurdere was also known as Donna Parisien and Donna Azure during the pertinent time. See Docket No. 48-24, p. 6.

6

See Docket No. 49-17, p. 2 (emphasis in original).  Although the School Board approved the reorganization of the Food Services department, it declined to approve a RIF.  The Bureau of Indian Affairs Manual ("BIA Manual") states that the "Director [of the Office of Indian Education Programs] is responsible for granting approval to conduct reductions-in-force involving education positions" but adds that "all requests [for RIFs] must be approved by the appropriate school board prior to submission."  See Docket No. 49-12, p. 11.  Gourneau sought approval for the RIF of Lunday's position and the five part-time food service staff from the Office of Indian Education Programs even though the School Board did not approve the RIF.

Gourneau first sought approval for the RIF from the Educational Line Office.  The Educational Line Office supported the RIF and Education Line Officer Rose Davis requested approval of the RIF from the Office of Indian Education Programs.  See Docket Nos. 49-18 and 49-20.  The acting Director of the Office of Indian Education Programs approved the RIF on June 14, 2005.  See Docket Nos. 49-18 and 49-21.

On July 1, 2005, Gourneau notified Lunday that her position was subject to the RIF "[d]ue to a deficiency in the food service budget . . . ."  See Docket No. 54-8.  Gourneau subsequently wrote a memorandum to Education Line Officer Davis on October 28, 2005, which explained the RIF was due to budget shortfalls in the Food Service department, along with additional factors that contributed to the overall budget problems at the School.  See Docket No. 54-5, pp. 21-22.  Gourneau explained that the state "[r]eimbursement dollars are never enough to cover salaries and food supplies needed to operate the Food Services department, the additional dollars to operate the Food Service department must come from regular ISEP program dollars", and that ISEP dollars were already strained due to staff salary increases, lower student enrollment, high transportation costs, and decreases in special education funding.

During the school year following the RIF, four male school bus drivers at the School began working part-time in the Food Services department essentially taking over the responsibilities of the five female part-time workers subject to the RIF. See Docket No. 54-3, pp. 13-14. Donna Azure-Lavurdere, the business manager at the School, took over the fiscal management of the Food Services department which was previously Lunday's responsibility. See Docket No. 54-3, p. 13.

On November 9, 2007, Lunday filed a complaint in which she alleged claims of sexual harassment hostile workplace, gender discrimination, and retaliation. See Docket No. 1. Lunday subsequently filed an amended complaint on November 12, 2009, in which she re-alleged the same three causes of action. See Docket No. 24. The Defendants filed a "Motion for Summary Judgment" on June 10, 2011. See Docket No. 47.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Davison v. City of Minneapolis, Minn., 490 F.3d 648, 654 (8th Cir. 2007); Fed. R. Civ. P. 56(a). Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party. Id. Although past decisions have stated that summary judgment should be used in employment discrimination cases sparingly, there is no "'discrimination case exception' to the application of summary judgment." Torgerson v. City of Rochester, Minn., 643 F.3d 1031, 1043 (8th Cir. 2011). Instead, the summary judgment standard applies to employment discrimination actions as it would in any other case. Id.

### III.    LEGAL DISCUSSION

Lunday alleged three causes of action in her amended complaint which included gender discrimination, retaliation, and sexual harassment based on a hostile work environment.

#### A.    GENDER DISCRIMINATION

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Both parties agree that Lunday's gender discrimination claim should be analyzed under the burden shifting standard established by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See also Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004) (explaining the McDonnell Douglas analysis should be used when the plaintiff relies on indirect evidence).

Lunday has the burden to establish a prima facie case of gender discrimination. She must show that (1) she is a member of a protected class; (2) she was qualified to perform her job; (3) she suffered an adverse employment action; and (4) the circumstances permit an inference of discrimination. Lewis v. Heartland Inns of Am., LLC, 591 F.3d 1033, 1038 (8th Cir. 2010). If Lunday establishes a prima facie case, the burden then shifts to the Defendants to present a legitimate non-discriminatory reason for taking the allegedly discriminatory action. Id. The burden ultimately returns to Lunday to prove that the Defendants' proffered justification is pretexual. Id. The record reveals that Lunday is a member of a protected class and she was qualified to perform her job. The Defendants essentially dispute whether Lunday has presented sufficient evidence to show she suffered an adverse employment action and whether an inference of discrimination arose under the circumstances.

"A prima facie case of discrimination requires the employee to present evidence of an adverse employment action brought on by the employer's discriminatory motive." MacGregor v. Mallinckrodt, Inc., 373 F.3d 923, 927-28 (8th Cir. 2004). "Adverse employment actions must have a 'materially adverse impact' on the plaintiff's terms or conditions of employment under Title VII." Sowell v. Alumina Ceramics, Inc., 251 F.3d 678, 684 (8th Cir. 2001) (quoting Coffman v. Tracker Marine, L.P., 141 F.3d 1241, 1245 (8th Cir. 1998)). This may include "'termination, cuts in pay or benefits, and changes that affect an employee's future career prospects,' as well as 'circumstances amounting to a constructive discharge.'" Clegg v. Ark. Dep't of Corr., 496 F.3d 922, 926 (8th Cir. 2007) (quoting Higgins v. Gonzales, 481 F.3d 578, 584 (8th Cir. 2007)). However, "'[m]inor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not' rise to the level of an adverse employment action." Id. Actions that cannot be deemed adverse include "changes in the terms, duties, or working conditions that cause no materially significant disadvantage to the employee; an employer's demand, which was later withdrawn with no impact on employee's continued employment, that an employee take a drug test; or disappointment with changes in one's employment situation." Sowell, 251 F.3d at 684.

In this case, Lunday clearly was subjected to an adverse employment action when her position was eliminated and she was terminated. The only element of a prima facie case that remains is whether the facts and circumstances give rise to an inference of discrimination.

The Defendants contend that Lunday was subject to the RIF due to budget deficits in the Food Service department which the Court finds is a legitimate, non-discriminatory reason for the alleged discriminatory act. Therefore, the burden shifts back to Lunday to (1) present evidence creating a fact issue as to whether the employer's proffered reasons are pretexual; and (2) present evidence that supports a reasonable inference of unlawful discrimination. Young v. Warner-Jenkinson Co., Inc.,

10

152 F.3d 1018, 1023 (8th Cir. 1998) (citing Rothmeier v. Investment Advisors, Inc., 85 F.3d 1328, 1336-37 (8th Cir. 1996)). The Court will consider "evidence used to support the prima facie case along with other evidence before the court to determine whether there exists a triable fact on the ultimate issue of discrimination." Anderson v. Durham D & M, L.L.C., 606 F.3d 513, 521 (8th Cir. 2010) (quoting Dixon v. Pulaski Cnty. Sch. Dist., 578 F.3d 862, 868 (8th Cir. 2009)) (internal quotations omitted). There are at least two ways to demonstrate that a material question of fact exists regarding pretext. Id. (citing Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1120 (8th Cir. 2006)). "First, a plaintiff may succeed 'indirectly' by showing the proffered explanation has 'no basis in fact.' Second, a plaintiff can 'directly' persuade the court that a 'prohibited reason more likely motivated the employer.'" Id.

Lunday contends the Defendants provided "shifting" justifications for the RIF. "'Substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext'" and may also provide an inference of discrimination. Wierman v. Casey's Gen. Stores, 638 F.3d 984, 995 (8th Cir. 2011) (quoting Smith v. Allen Health Sys., Inc., 302 F.3d 835 (8th Cir. 2002)); Young, 152 F.3d at 1023-24. The Eighth Circuit has held that a plaintiff showed both pretext and an inference of discrimination where the employer gave completely inconsistent reasons for dismissing an employee and the plaintiff produced evidence which tended to refute the employer's reasons for terminating the employee. Young, 152 F.3d at 1023-24. However, it is clear that minor discrepancies in an otherwise consistent explanation of why an employee was dismissed do not create an inference of pretext. EEOC v. Trans States Airlines, Inc., 462 F.3d 987, 994-95 (8th Cir. 2006).

The record reveals that David Gourneau initially told Donna Lunday the RIF was due to budget shortfalls in the Food Service department. See Docket No. 54-8. He later explained in a memorandum to Education Line Officer Rose Davis that the RIF occurred because of the Food

11

Service department's deficits, along with other factors which impacted the ISEP funds such as lower enrollment, higher fuel costs, staff salary increases, and special education funding decreases. See Docket No. 54-5, pp. 21-22. After Lunday initiated this lawsuit, she submitted interrogatories to the Defendants which asked the Defendants to describe the reasons for the RIF and describe any purported shortage of funds that it relied upon as necessitating the RIF. See Docket No. 49-23, p. 5. The Defendants answered, respectively:

> Answer [to Interrogatory No. 4]: The reorganization and reduction in force were recommended and approved due to a lack of funds and a projected deficit in the food service budget.
> \*\*\*
> Answer [to Interrogatory No. 5]: The shortage of funds resulted from a large deficit in the school lunch program budget.

See Docket No. 49-23, p. 5. In the Defendants' memorandum in support of their motion for summary judgment, they argue the RIF occurred because of budget shortfalls in the Food Service department along with the other budget problems recited in Gourneau's memorandum to Education Line Officer Davis. Lunday argues the Defendants "shifted" or changed the reasons for the RIF because their arguments in their memorandum went beyond their interrogatory answers.

The Defendants' inconsistent discussion of the budget problems that led to the RIF is different from the type of "shifting explanation" that would give rise to an inference of pretext. In Young, the defendants provided two completely different explanations for their decision to terminate the plaintiff. See Young, 152 F.3d at 1023-24 (employer initially stated the employee's deficient performance was the basis for his termination and subsequently stated the employee was dismissed not because of deficient performance but because no work was available). In this case, the Defendants have always maintained that Lunday was terminated because of budget deficits in the Food Services department. The Defendants intermittently discussed budget problems at the School

which ultimately impacted the Food Service department's budget. Although the Defendants failed to consistently discuss all of the factors that impacted the Food Service department's budget, minor discrepancies in an otherwise consistent explanation do not give rise to a material issue of fact regarding pretext. Trans States Airlines, Inc., 462 F.3d at 995.

In addition, unlike the plaintiff in Young, Lunday failed to offer any relevant evidence to refute the Defendants' proffered basis for the RIF. Gourneau, Azure-Lavurdere, and Education Line Officer Davis each said that the Food Service department exceeded its budget. The Defendants introduced a memorandum that showed the Food Services department had a deficit of $65,316 in 2002-03 and $131,213 in 2003-04. See Docket No. 48-25, p. 16. The deficit numbers were calculated based on the Federal Finance System, the accounting system used by the School. See Docket No. 48-24, pp. 35-36. Lunday asserted the Defendants' numbers were inaccurate. Specifically, she contended the Food Service department received $100,000 from the Belcourt School District which was unaccounted for and would have eliminated or substantially reduced the calculated deficits. However, the Belcourt School District funds were paid directly to the Food Services' vendors by the School District. See Docket No. 55-2. The district funds and the expenses paid with those funds were excluded from the Federal Finance System calculations. See Docket No. 55-1. The district funds would not have impacted the accuracy of the deficit calculations in the Federal Finance System because the district funds did not increase or decrease the Food Services department's budget.

Lunday also contends that disputed factual issues exist because male school bus drivers assumed the duties of the terminated part-time female food service employees after the RIF. Disparate treatment of similarly-situated members of the opposite sex can provide an inference of discrimination, but only if the plaintiff and the employee(s) offered as a comparison are similarly-situated in all relevant respects. Wimbley v. Cashion, 588 F.3d 959, 962 (8th Cir. 2009). Lunday

13

has not demonstrated that she was similarly-situated to the school bus drivers in all relevant respects. Further, there is no evidence Lunday's duties were assumed by men after the RIF. The record reveals that Lunday's responsibilities were transferred in part to a woman, School business manager Donna Azure-Lavurdere. See Docket No. 54-3, p. 12. The School cook also assumed some of Lunday's other responsibilities such as meal planning and supervising the food service staff, but Lunday failed to submit evidence as to the gender of the cook after the RIF.

The Court has carefully reviewed the record and considered the parties briefs and arguments. The Court finds that Lunday has failed to show there are material issues of fact as to whether the Defendants' non-discriminatory basis for the RIF is pretexual or whether the facts and circumstances give rise to an inference of gender discrimination. As a result, summary judgment is granted as to the Plaintiff's claim of gender discrimination.

### B.  **RETALIATION**

Lunday claims she was subjected to a RIF as retaliation for filing a complaint of discrimination with the Equal Employment Office. "Title VII makes it unlawful for the employer to 'discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge' of discrimination against the employer." Tyler v. Univ. of Ark. Bd. of Trustees, 628 F.3d 980, 985 (8th Cir. 2011) (quoting 42 U.S.C. § 2000e-3(a)). It is well-established that Title VII anti-retaliation provision prevents employers from retaliating against employees who have acted to vindicate their statutorily-protect rights by reporting harassment or discrimination in the workplace. Bannum v. Mo. Dep't of Corr., 518 F.3d 542, 547 (8th Cir. 2008). To analyze a retaliation claim

under Title VII, the McDonnel Douglas three-part burden-shifting analysis is again applied. Erenberg v. Methodist Hosp., 357 F.3d 787, 793 (8th Cir. 2004).

To establish a prima facie case of Title VII retaliation, Lunday must demonstrate that (1) she engaged in protected conduct; (2) she was subjected to a materially adverse action that would deter a reasonable employee from making a charge of employment discrimination; and (3) there is a causal nexus between the protected conduct and the adverse action. Tyler, 628 F.3d at 985 (citing Heartland Inns of Am., 591 F.3d at1042); Farcello v. Cnty. of Ramsey, 612 F.3d 1069, 1077-78 (8th Cir. 2010) (citing Wegner v. City of Ladue, 500 F.3d 710, 726 (8th Cir. 2007)). The Court finds that the first two elements are not in dispute. The parties' dispute concerns whether a causal nexus exists between Lunday's discrimination complaint and the RIF.

Lunday contends the close temporal proximity between the RIF and the time that Gourneau had notice that she contacted an EEO counselor establishes the causal connection. Although an inference of retaliation may arise where the alleged retaliatory conduct occurs within close temporal proximity to the protected activity, the greater the time gap between the protected activity and the alleged retaliatory act, the weaker the inference of retaliation. Tyler, 628 F.3d at 986 (citing Sims v. Sauer-Sundstrand Co., 130 F.3d 341, 343 (8th Cir. 1997)). The Eighth Circuit has recognized that when the time gap is measured in months, no inference of retaliation can reasonably be found based solely on timing. Id. (citing Lewis v. St. Cloud State Univ., 467 F.3d 1133, 1138 (8th Cir. 2006)) ("We have held that an interval as brief as two months did not show causation for purposes of establishing a retaliation claim and that a two-week interval was 'sufficient, but barely so.'").

The record reveals that Donna Lunday first discussed the allegations with an EEO counseler on January 10, 2005. The EEO counselor contacted David Gourneau on January 25, 2005 to discuss Lunday's allegations. See Docket No. 54-2, p. 3. Lunday argues the Defendants retaliated against

15

her by terminating her employment. See Docket No. 54, p. 21. The record is not clear as to when Gourneau first sought approval for the RIF. On April 11, 2005, he presented a vague "reorganization" plan for the Food Service department to the School Board which was approved. In a deposition, Gourneau claimed that he interpreted the School Board's approval of the reorganization plan as sufficient to approve the RIF. This seems improbable because he sought explicit approval of a RIF from the School Board at the next board meeting on May 16, 2005. Even if the Court assumed that the recommendation for a RIF was initiated on April 11, 2005, when Gourneau requested a reorganization of the Food Services department, that request occurred two and one-half months after the School and Gourneau first became aware that Lunday had contacted an EEO counselor. See Lewis v. St. Cloud State Univ., 467 F.3d at 1138 (noting that an interval of two months by itself was held to be too attenuated to provide a causal connection). The Court finds that the temporal proximity in this case, in and of itself, is not close enough to demonstrate an inference of retaliation.[3]

Lunday also contends retaliation was shown because the Defendants failed to follow the proper procedure for a RIF. The BIA Manual states that ". . . all requests [for RIFs] must be approved by the appropriate school board prior to submission." See Docket No. 49-12, p. 11. The Turtle Mountain School Board did not approve the RIF, but Lunday was nonetheless terminated when the Office of Indian Education Programs approved the RIF. See Docket Nos. 49-18, 49-20, and 49-

---

[3] Lunday appears to imply the temporal proximity was much closer. Lunday notes the EEO accepted her discrimination complaint on May 10, 2005 and within six days Gourneau asked the School Board for approval of the RIF on May 16, 2005. However, the EEO's conduct on May 10, 2005, lacks relevance here because the School already knew about Lunday's allegations on January 25, 2005 when the EEO counselor contacted David Gourneau about the allegations of discrimination. Further, the EEO's acceptance of a claim, an act Lunday took no part in, would not be considered protected activity engaged in by Lunday. See Clark County School Dist. v. Breeden, 532 U.S. 268, 273 (2001) (noting the EEOC's conduct may be relevant to show when an employer received first notice of Title VII allegations but rejecting as "utterly implausible" the argument that EEOC's issuance of a right-to-sue letter, an act the employee took no part in, could be considered protected activity of the employee).

16

21. Failure to follow an established mandatory procedure has been held to constitute evidence of discriminatory intent. See Rudin v. Lincoln Land Cmty. Coll., 420 F.3d 712, 723 (7th Cir. 2005) (holding inference of discrimination was shown where the defendant employer failed to follow its internal hiring procedures). A reasonable inference of retaliation is shown here because the Defendants arguably failed to follow their own procedures in order to effectuate Lunday's termination. Accordingly, the Court finds that Lunday has presented sufficient evidence to establish a prima facie case of retaliation.

The Defendants contend that Lunday was subject to the RIF because of budget deficits in the Food Services department which the Court finds is a legitimate, non-discriminatory reason for the RIF. Therefore, the burden then shifts back to Lunday to show there is a genuine issue of fact regarding pretext and retaliation. Tyler, 628 F.3d at 987-89.

Lunday argues that pretext is shown by the Defendants' "shifting" justification for the RIF. For the same reasons as previously outlined, the Court rejects this argument. In the final stage of the McDonnel Douglas analysis, the party opposing summary judgment must "present evidence creating a fact issue as to whether the employer's proffered reasons are pretextual . . . ." Young, 152 F.3d at 1023 (quoting Rothmeier, 85 F.3d at 1336-37). The Court finds that Lunday has failed to present sufficient evidence which creates a fact issue as to whether the proffered reasons for the RIF are pretexual in nature. Summary judgment is granted as to Lunday's retaliation claim because she has failed to demonstrate an inference of pretext.

      C.     **SEXUAL HARASSMENT/HOSTILE WORK ENVIRONMENT**

"'Sexual discrimination that creates a hostile or abusive work environment is a violation of Title VII of the Civil Rights Act of 1964.' A hostile work environment 'arises when sexual conduct

has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.'" Vajdl v. Mesabi Acad. of KidsPeace, Inc., 484 F.3d 546, 549-50 (8th Cir. 2007) (quoting Hall v. Gus Constr. Co., Inc., 842 F.2d 1010, 1013 (8th Cir. 1988)). A claim of hostile work environment requires "a high evidentiary showing that the plaintiff's workplace is 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Vajdl, 484 F.3d at 550 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).

Lunday's hostile work environment/sexual harassment claim is also evaluated under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Erenberg, 357 F.3d at 792. Under this framework, Lunday bears the initial burden of establishing by a preponderance of the evidence a prima facie case of hostile work environment. Once this showing is made, the burden then shifts to the Defendants to articulate a legitimate, non-discriminatory reason for its actions. If the Defendants offer such a reason, the burden then shifts back to Lunday to establish by a preponderance of the evidence that the Defendants' reason is in reality a pretext for unlawful discrimination.

To establish a prima facie case for hostile work environment, Lunday is required to show: (1) that she is a member of a protected class; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on gender; (4) that the harassment affected a term, condition, or privilege of her employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt remedial action. Vajdl, 484 F.3d at 550. The standard for a hostile work environment claim is relatively stringent:

18

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

Woodland v. Joseph T. Ryerson & Son, Inc., 302 F.3d 839, 843 (8th Cir. 2002) (quoting Harris, 510 U.S. at 21-23). "Merely offensive conduct is not enough absent the requisite effect on the terms or conditions of employment. Title VII does not 'impose a code of workplace civility.'" Woodland, 302 F.3d at 843 (quoting Palesch v. Mo. Comm'n on Human Rights, 233 F.3d 560, 567 (8th Cir. 2000)).

First, Lunday must establish that she is a member of a protected class. There is no dispute that Lunday, a female, is a member of a protected class. Lunday must then show that she was subjected to unwelcome harassment based on gender, and that the harassment affected a term or condition of her employment. In order to satisfy this last factor, Lunday must show that the conduct was so severe "as to create an *objectively* hostile work environment that altered the terms, conditions, or privileges of employment." Willis v. Henderson, 262 F.3d 801, 808 (8th Cir. 2001) (emphasis in original). To determine whether alleged harassment affected a term, condition, or privilege of Lunday's employment, the Court must consider the totality of the circumstances "'including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Cottrill v. MFA, Inc., 443 F.3d 629, 636 (8th Cir. 2006) (quoting Faragher v. City of Boca Raton, Fla., 524 U.S. 775, 787-88 (1998)). "To be actionable, the conduct complained of must be extreme in nature and not merely rude or unpleasant." Nitsche v. CEO of Osage Valley Elec. Coop., 446 F.3d 841, 846 (8th Cir. 2006).

In Lunday's response to the Defendants' motion for summary judgment, she did not specifically address her hostile workplace claim. See Docket No. 54. Instead, Lunday merely made reference to the hostile workplace claim as part of her argument which addressed the claim of gender discrimination. See Docket No. 54, p. 14. Sexual harassment based on a hostile work environment and gender discrimination are separate and distinct claims. Compare Vajdl, 484 F.3d at 550 (providing the elements of a prima facie case for hostile workplace) with Heartland Inns of Am., 591 F.3d at 1038 (providing the elements of a prima facie case for gender discrimination).

Nevertheless, in carefully considering the entire record and the totality of the circumstances, the Court finds the allegations of sexual harassment fail to raise a genuine issue of material fact to support a claim of hostile work environment/sexual harassment. The Turtle Mountain Elementary School where Donna Lunday worked in Belcourt, North Dakota, is certainly not a model work environment nor was the principal, David Gourneau, a role model for a supervisor in the modern day workplace. The conduct of Gourneau can best be described as dysfunctional, offensive, and unprofessional. However, Title VII does not impose a code of workplace civility. Lunday has failed to establish a prima facie case for a claim of hostile work environment and summary judgment is warranted on this claim.

## IV.   CONCLUSION

The Court has carefully reviewed the entire record and relevant case law. For the reasons set forth above, the Court **GRANTS** the Defendants' "Motion for Summary Judgment" (Docket No. 47).

Dated this 29th day of November, 2011.

*/s/  Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court